IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

:

RUSSELL FAIR

:

　　　v.                          : Civil Action No. DKC 2005-1306

:

GIANT OF MARYLAND LLC[1]

:

### MEMORANDUM OPINION

　　　Presently pending and ready for resolution in this case are (1) Defendant Giant of Maryland LLC's, motion to dismiss or for summary judgment (paper 13); (2) Plaintiff Russell Fair's motion to remand to the Circuit Court for Montgomery County, Maryland (paper 14); and (3) Plaintiff's requests to stay decisions on both motions pending discovery.   The issues have been fully briefed and the court now rules pursuant to Local Rule 105.6, no hearing being deemed necessary.   For the reasons that follow, the court denies Plaintiff's motion to remand and his accompanying request to stay the decision pending discovery.   The court denies Defendant's motion for summary judgment and denies Plaintiff's request to stay the decision pending discovery as moot.

---

　　　[1] Defendant asserts that the caption of the complaint improperly names Defendant as "Giant Food," and that Defendant's correct name is Giant of Maryland LLC.  Plaintiff does not dispute this assertion.  The court will refer to Defendant as Giant of Maryland.

I.    **Background**

A.  **Factual Background**

In 1976, Plaintiff began working for Giant as a Pharmacy Manager.[2]   Plaintiff was promoted to Pharmacy Liaison to Information Systems in 1985, and to Third Party Manager in 1987. In 1991, Plaintiff was promoted to Vice President of Pharmacy Operations.   In late 1997 and early 1998, Giant Food Inc. offered a "Change in Control and Severance Agreement" ("Agreement") to twenty-two of its officers and senior executives, including Plaintiff.   The Agreement was offered to encourage these employees to remain with the company during a period of uncertainty following the death of the company's founder.   Plaintiff executed his Agreement on October 27, 1997.

The Agreement provides for, among other things, the payment of certain benefits when a "change in control" happens in conjunction with one of three events.[3]   "Change in control" is defined in the Agreement and can occur in four circumstances: a merger or consolidation with any entity not controlled by the 1224 Group; a transfer, sale, or exchange of ownership of the Class AC stock to

_____

[2] Plaintiff refers to his employer only as "Giant Food." Defendant asserts that Plaintiff previously worked for Giant Food Inc., but now works for Giant of Maryland LLC.  (Paper 13, at 3). Defendant refers to Giant Food Inc. as "a predecessor of an affiliate of Giant of Maryland."  (Paper 23, at 2).

[3] The Agreement also provides for severance benefits in the absence of a change in control, but those provisions are not at issue.  (Paper 2, Attachment 1, Agreement at 3).

any entity not controlled by the 1224 Group; any transfer by the 1224 Corporation of its voting power over the Class AC stock to any entity not controlled by the 1224 Group; or any redemption of the Class AC stock or any other action that eliminates the special voting power of the Class AC stock.[4]   (Agreement, at 1).   With regard to the second triggering event, the Agreement states:

> You will be entitled to receive the Change in Control benefits only if either:
>
> (i) You terminate your employment within 24 months after a Change in Control for good reason; or
>
> (ii) The Company terminates Your employment within 24 months after a Change in Control, for any reason other than for cause or Your physical or mental incapacity; or
>
> (iii) The Company terminates Your employment during the six-month period immediately preceding a Change in Control, for any reason other than for cause or Your physical and mental incapacity, and such termination (i) is made at the request of a third party who had taken steps reasonably calculated to effect a Change in Control that later occurred, or (ii) otherwise arose in connection with or anticipation of a Change in Control that later occurred.

---

[4] The 1224 Group is defined as "any persons who were shareholders of the 1224 Corporation within the prior 24 months." The term "1224 Corporation" is not specifically defined in the Agreement, but Defendant asserts it refers to Giant Food Inc. (Paper 13, at 6).

(Agreement, at 3).[5]   Both "cause" and "good reason" are further defined in the Agreement:

> "Cause" shall mean any act or omission to act, or any series of acts or omissions to act, or any course of conduct by You that, in the opinion of a majority of the Company's Board acting in good faith, constitutes reckless, unethical, or criminal misconduct, willful misfeasance, gross negligence or any other material breach of Your duties to the Company. . . .

> "Good Reason" shall mean any action taken by the Company, including any change in Your titles, authority, duties or responsibilities from those in effect during the immediately preceding 180-day period which results in a permanent and material diminution in an officer's position, authority, duties or responsibilities within the Company; unless either (i) such action is taken by the Company for cause, or (ii) such action results from termination or outsourcing by the Company of a department or function.

(Agreement, at 1-2).

If there is a change in control and one of the second triggering conditions occurs, an employee is entitled to receive: (i) the employee's base salary in effect on the date prior to termination, (ii) "bonus continuation" based on the average bonus percentage paid during the three prior years under the Company's executive bonus plan; and (iii) medical and life insurance coverage comparable to that provided to other officers who remain employed

---

[5] The Agreement initially defines "Company" as Giant Food Inc., but later expands the definition to include certain successors.

with the Company.  (Agreement, at 2-3).  An employee will receive
the change in control benefits for twenty-four months, unless the
benefits are terminated prior to that time under any other
provision of the Agreement.[6]

Finally, the Agreement provides that Giant Food Inc. will
"require any successor (whether direct or indirect, by purchase,
merger, consolidation or otherwise) to all or substantially all of
the business and/or assets of the Company to expressly, absolutely
and unconditionally assume and agree to perform this Agreement" in
the same manner as would Giant Food Inc.  (Agreement, at 7).

In 1998, Royal Ahold, a Dutch company, acquired  Giant Food
Inc.  Following this acquisition Defendant Giant Food Inc.'s name
changed to Ahold USA Holdings Inc.  (Paper 13, ex. A., Decl. of
Robert Licht, at 1).  Both parties agree that this acquisition was
a change in control, as defined in the Agreement.  Plaintiff makes
contradictory statements regarding whether he sought to enforce his
rights under the Agreement during this acquisition.  The complaint
states:  "Fortunately, Mr. Fair did not need to exercise his rights
under the Agreement during the Royal Ahold transition."  (Paper 2,
at 4).  Conversely, in an affidavit, Plaintiff states: "In 1999, I

---

[6] For example, benefits will cease upon the employee's
attainment of age 65 or when the employee begins to receive early
retirement benefits, notwithstanding the twenty-four month time
period.  Moreover, there is no entitlement to any change in control
benefits unless an employee waives his or her right to other
severance benefits, and repays any severance benefits previously
received.

attempted to exercise my rights under the Agreement during the Royal Ahold transition," but he changed his mind after Giant's President pleaded with him to continue his employment. (Paper 24, ex. B, at 2). The court need not address Plaintiff's inconsistencies regarding whether he sought to enforce the Agreement during this time period because it is not material to the resolution of the current claim, which centers on Plaintiff's rights following changes that occurred in the company during 2003-2004.[7]

On November 10, 2003, Royal Ahold announced its decision to consolidate two of its United States retail food chains, Giant and Stop & Shop. Over the course of the next year, Royal Ahold implemented changes to realize the efficiencies of the merger.[8] Plaintiff maintains that although some Giant employees were offered retention bonuses during the implementation period, David White, Director of Human Resources for Giant, told Plaintiff he would not be offered a retention bonus because he was still covered by the Agreement. On April 7, 2004, Plaintiff met with Mr. White, Bill Holmes, General Manager for Stop & Shop, and John Vega, Vice

---

[7] Plaintiff does not argue that any initial invocation of the Agreement directly following the 1998 Royal Ahold acquisition preserved his rights to receive change in control benefits at a later time.

[8] For example, during April 2004, Giant informed 650 employees at its Maryland headquarters that most of their jobs would be eliminated or relocated as a result of the merger with Stop & Shop.

President of Pharmacy Operation for Stop & Shop.  They offered Plaintiff a new job as Senior Director of Pharmacy Operations. Following this offer, Plaintiff asked Ira Kress, Vice President for Field Human Resources, whether the Agreement provided for severance and benefits should he decline the job offer.[9]  (Paper 27, ex. 1B). In response, Mr. Kress told Plaintiff that the change in control provisions of the Agreement expired twenty-four months following the Royal Ahold acquisition of Giant Food Inc.  In a letter dated May 4, 2004, Plaintiff accepted the new job, but noted that he was "not waiving any of [his] rights under the Change and Control and Severance Agreement."  (Paper 27, ex. 1C).  Plaintiff maintains that the new position is not equivalent to his previous job, and that his direct reports have been eliminated and he has been stripped of all real responsibilities over pharmacy operations.

B.  **Procedural Background**

On January 25, 2005, Plaintiff filed a complaint in the Circuit Court for Montgomery County, Maryland.  Pursuant to the Maryland Uniform Declaratory Judgment Act, Plaintiff seeks a declaratory judgment regarding his rights and obligations under the Agreement.  Md. Code. Ann., Ct. & Jud. Proc. § 3-401.  Plaintiff seeks an Order declaring: (a) the Agreement remains in effect; (b) the merger of Giant and Stop & Shop constitutes a change in control; (c) Plaintiff's demotion allows him to terminate his

_____

[9] It is unclear exactly what entity Mr. Kress worked for.

7

employment for "good reason;" and (d) other relief the Court deems appropriate, including costs and attorneys' fees.  On May 13, 2005, Defendant removed the case to this court, pursuant to 28 U.S.C. §§ 1441, 1446.  Defendant maintains that the Agreement is an employee welfare benefit plan governed by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001, *et seq*.  Moreover, Defendant asserts that Plaintiff's state law claim is pre-empted by ERISA.

On June 3, 2005, Defendant filed a motion to dismiss, or for summary judgment.  (Paper 13).  On June 10, 2005, Plaintiff filed a motion to remand, based on his assertion that the Agreement is not governed by ERISA and thus this court lacks subject matter jurisdiction.  On August 18, 2005, the case was referred to Magistrate Judge Day for settlement.  A settlement conference was held on October 24, 2005, but no settlement was reached.

## II.  Motion to Remand

### A.  Standard of Review

On a motion to remand, the court must "strictly construe the removal statute and resolve all doubts in favor of remanding the case to state court," which is indicative of the reluctance of federal courts "to interfere with matters properly before a state court." *Richardson v. Phillip Morris Inc.*, 950 F.Supp. 700, 701-02 (D.Md. 1997) (internal quotation marks omitted); *see also Mulcahey v. Columbia Organic Chems. Co., Inc.*, 29 F.3d 148, 151 (4th Cir.

1994).  The party seeking removal bears the burden of establishing federal jurisdiction exists.  *Sonoco Prods. Co. v. Physicians Health Plan, Inc.*, 338 F.3d 366, 370 (4th Cir. 2003); *Green v. H & R Block, Inc.*, 981 F.Supp. 951, 953 (D.Md. 1997).  Generally, an action brought in state court can only be removed if it could have been brought in federal court initially.  *Sonoco*, 338 F.3d at 370.  Moreover, for purposes of federal question jurisdiction, "a cause of action arises under federal law only when the plaintiff's well-pleaded complaint raises issues of federal law."  *Metro. Life Ins. Co. v. Taylor*, 481 U.S. 58, 63 (1987).

**B.  Analysis**

**1.  Pre-emption Doctrines and ERISA**

Defendant maintains that removal is proper because the Agreement is governed by ERISA and Plaintiff's state law claim is pre-empted.  To determine whether removal is proper based on ERISA pre-emption, it is necessary to distinguish between the doctrines of ordinary conflict pre-emption and complete pre-emption.  *Sonoco*, 338 F.3d at 370-71.  Under the doctrine of conflict pre-emption, state laws that conflict with federal laws are pre-empted, and pre-emption is asserted as a federal defense to the plaintiff's state court law suit.  *Id*.  Because conflict pre-emption is a "defense," it does not generally appear on the face of a plaintiff's complaint, and thus is not the proper basis for removal to federal court.  *Taylor*, 481 U.S. at 63; *Sonoco*, 338 F.3d at 371.

Conversely, with complete pre-emption, there is a basis for federal jurisdiction:

> In the case of complete preemption, however, Congress "so completely pre-empt[s] a particular area that any civil complaint raising this select group of claims is necessarily federal in character." *Taylor*, 481 U.S. at 63-64, 107 S.Ct. 1542. That is to say, the doctrine of complete preemption "converts an ordinary state common law complaint into one stating a federal claim." *Id*. at 65, 107 S.Ct. 1542. Thus, the doctrine of complete preemption serves as a corollary to the well-pleaded complaint rule: because the state claims in the complaint are converted into federal claims, the federal claims appear on the face of the complaint. *Id*. at 63-65, 107 S.Ct. 1542.

*Darcangelo v. Verizon Commc'ns Inc*., 292 F.3d 181, 187 (4th Cir. 2002).

The Fourth Circuit clarified the role each pre-emption doctrine plays in the ERISA context:

> [T]he doctrines of conflict preemption and complete preemption are important, and they are often confused. Section 514 of ERISA defines the scope of ERISA's preemption of conflicting state laws: state laws are superceded insofar as they "relate to" an ERISA plan. 29 U.S.C. § 1144(a). The fact that a state law claim is "preempted" by ERISA – i.e., that it conflicts with ERISA's exclusive regulation of employee welfare benefit plans – does not, however, provide a basis for removing the claim to federal court. The only state law claims properly removable to federal court are those that are "completely preempted" by ERISA's civil enforcement provision, § 502(a). [29 U.S.C. § 1132(a)]. *Darcangelo*, 292 F.3d at 187 (emphasizing that the civil enforcement provision "completely preempts state law

> claims that come within its scope and converts
> these state claims into federal claims under §
> 502"); *see also Taylor*, 481 U.S. at 65-66, 107
> S.Ct. 1542 (same).

*Sonoco*, 338 F.3d at 371 (footnote omitted).[10]

There are three requirements for a state law claim to be completely pre-empted, and thus, properly removed:

> (1) the plaintiff must have standing under §
> 502(a) to pursue [the] claim; (2) [the] claim
> must "fall[] within the scope of an ERISA
> provision that [plaintiff] can enforce via §
> 502(a)"; and (3) the claim must not be capable
> of resolution "without an interpretation of
> the contract governed by federal law," i.e.,
> an ERISA-governed employee benefit plan.

*Sonoco*, 338 F.3d at 372 (quoting *Jass v. Prudential Health Care Plan, Inc.*, 88 F.3d 1482, 1487 (7th Cir. 1996)).

ERISA's civil enforcement provision, § 502(a), provides that a civil action may be brought by a participant or beneficiary of an ERISA governed plan.  There is no dispute that if ERISA governs the Agreement, Plaintiff, as a participant, has standing to pursue a claim.  Moreover, Plaintiff's claim cannot be resolved without an interpretation of the Agreement.  Thus, the only issue is whether Plaintiff's claim for declaratory relief falls within the scope of

_____

[10] Defendant fails to distinguish between the two pre-emption doctrines, and appears to justify removal based on both § 502(a) (ERISA's complete pre-emption provision) and § 514 (ERISA's conflict pre-emption provision).  (Paper 1 at 3-4 (citing both provisions)); (Paper 23 at 9 (quoting § 514, and stating that "[b]y its terms, ERISA pre-empts 'any and all State laws insofar as they now or hereafter relate to an employee benefit plan.'")).  Nevertheless, in order for removal to be proper, Plaintiff's state law claim must be completely pre-empted pursuant to § 502(a).

an ERISA provision that Plaintiff can enforce under § 502(a).
Section 502(a)(1)(B) provides that a participant or beneficiary may
bring a civil action to "clarify his rights to future benefits
under the terms of the plan."   29 U.S.C. § 1132(a).   Here,
Plaintiff seeks a declaration regarding his future right to
benefits; in dispute is whether the Agreement is a *plan* that is
governed by ERISA.

## 2.   ERISA Employee Benefit Plans

ERISA governs employee benefit plans.   29 U.S.C. § 1003.
Severance benefits, including those offered under the Agreement,
constitute employee "benefits" as defined under ERISA.   *Emery v.*
*Bay Capital Corp.*, 354 F.Supp.2d 589, 591 (D.Md. 2005).
Nevertheless, the fact that the Agreement addresses severance
benefits is not sufficient to bring it within the ambit of ERISA.
The Agreement must also constitute an employee benefit "plan."   *Id.*
In *Fort Halifax Packing Co. v. Coyne*, 482 U.S. 1, 8 (1987), the
Supreme Court noted that "the terms 'employee benefit plan' and
'plan' are defined only tautologically in the statute."
Accordingly, "courts have supplied the analytical framework missing
from the statute, although as one court notes, this area remains a
'cloudy corner of the law.'"   *Emery*, 354 F.Supp.2d at 591-92
(quoting *Belanger v. Wyman-Gordon Co.*, 71 F.3d 451, 455 (1st Cir.
1995)).

12

**a.   Ongoing Administrative Scheme**

In *Fort Halifax*, the Supreme Court provided some instruction regarding what constitutes an ERISA employee benefit plan.   At issue was whether a Maine statute requiring employers to make a one-time severance payment to employees in the event of a plant closing was pre-empted by ERISA.   The Supreme Court found that the statute was not pre-empted by ERISA because it did not establish or require an employer to maintain an employee benefit plan.   The court stated:

> Congress intended pre-emption to afford employers the advantages of a uniform set of administrative procedures governed by a single set of regulations.  This concern only arises, however, with respect to benefits whose provision by nature requires an ongoing administrative program to meet the employer's obligation.   It is for this reason that Congress pre-empted state laws relating to *plans*, rather than simply to *benefits*.  Only a plan embodies a set of administrative practices vulnerable to the burden that would be imposed by a patchwork scheme of regulation. . . . The requirement of a one-time, lump-sum payment triggered by a single event requires no administrative scheme whatsoever to meet the employer's obligation. The employer assumes no responsibility to pay benefits on a regular basis, and thus faces no periodic demands on its assets that create a need for financial coordination and control. Rather, the employer's obligation is predicated on the occurrence of a single contingency that may never materialize.   The employer may well *never* have to pay the severance benefits.   To the extent that the obligation to do so arises, satisfaction of that duty involves only making a single set of payments to employees at the time the plant closes.  To do little more than write a check

13

> hardly constitutes the operation of a benefit
> plan.  Once this single event is over, the
> employer has no further responsibility.  The
> theoretical possibility of a one-time
> obligation in the future creates no need for
> an ongoing administrative program for
> processing claims and paying benefits.

*Fort Halifax*, 482 U.S. at 11-12 (emphasis in original).

Following the *Fort Halifax* decision, courts have articulated and applied multi-factor tests in order to determine whether voluntarily adopted as well as state-mandated severance programs require an ongoing administrative scheme.[11]  Although the courts' descriptions of the factors may vary slightly, their considerations are highly similar.

The Eighth Circuit's approach, which is typical of other courts, *see Emery*, 354 F.Supp.2d at 593, examines multiple factors: whether the required employer payments are one-time lump sum payments or are continuous; whether the employer undertook any long-term obligation with respect to the payments; whether the severance payments come due upon the occurrence of a single, unique event or whenever the employer terminates employees; and whether the severance arrangement under review requires the employer to

---

[11] A majority of the courts of appeal have articulated specific factors to consider.  However, outside of a brief discussion in an unpublished opinion, *Lomas v. Red Storm Entm't, Inc.*, 49 Fed. Appx. 396, 400 (4th Cir. 2002), in which the court adopted the reasoning of an Eighth Circuit case, the Fourth Circuit has not articulated a particular test.  *See Emery v. Bay Capital Corp.*, 354 F.Supp.2d 589, 593 (D.Md. 2005) (applying the Eighth Circuit's multi-factor test).

engage in a case-by-case review of employees and use discretion to determine eligibility. *Emmenegger v. Bull Moose Tube Co.*, 197 F.3d 929, 934-35 (8th Cir. 1999). The court in *Emmenegger* applied these factors and found that the severance program at issue was an ERISA plan because there was no single event trigger, and the program would continue for as long as the employer had employees. Moreover, in assessing benefit eligibility, the employer had to exercise discretion in determining whether an employee was terminated for disciplinary reasons and whether the employee provided "excellent service" during his or her employment, both of which were conditions of payment.

Similarly, the First Circuit considered the length of the eligibility period, the need for individualized eligibility considerations, and the extent to which such determinations were mechanical or required the use of judgment. *Simas v. Quaker Fabric Corp. of Fall River*, 6 F.3d 849, 853-54 (1st Cir. 1993). The court concluded that Massachusetts' "tin parachute" statute was pre-empted by ERISA because its provisions required employers to create an ongoing administrative scheme to ensure compliance. The law mandated employers to pay benefits to each employee with three or more years of tenure who was discharged within two years after a takeover, if the employee was eligible for unemployment compensation under state law. State law conditioned unemployment compensation eligibility on termination without cause. Thus, the

employer's obligations ran for two years following a takeover, and for each terminated employee the employer was required to determine whether the termination was for cause.

Likewise, in *Bowles v. Quantum Chemical Company*, 266 F.3d 622, 631-32 (7th Cir. 2001), the Seventh Circuit examined whether the severance arrangement applied to multiple employees, whether the employer was obligated to make one lump-sum payment or periodic payments, and whether eligibility was within the discretion of the employer.  The court in *Bowles* found that the severance agreement was an ERISA plan.  First, multiple employees "had a one-year period in which they could make a demand for severance benefits, which required [the employer] to budget for the possibility of making multiple payments throughout the year." *Bowles*, 266 F.3d at 631.  Second, the court found that the plan "was not capable of a mechanical application, but required the existence of discretion[,]" because the employer had to determine whether the employee suffered a diminution in duties as a result of a change in control. *Id*.

The Eighth Circuit's final factor, the level of individualized consideration and employer discretion in eligibility determinations, weighs heavily in the courts' analyses.  In fact, some courts have placed sole emphasis on it. *See Bogue v. Ampex Corp.*, 976 F.2d 1319, 1323 (9th Cir. 1992) (considering the amount of discretion an employer has in determining eligibility); *Fontenot*

16

*v. NL Indus., Inc.*, 953 F.2d 960, 963 (5th Cir. 1992) (examining whether the employer was required to analyze the circumstances of each employee's termination in light of certain criteria in order to determine benefit eligibility). *See also Gilmore v. Silgan Plastics Corp.*, 917 F.Supp. 685, 688 (E.D.Mo. 1996) ("Most courts concluding that severance and similar benefits constitute an ERISA plan have done so because [] the employer's discretion in determining eligibility requires an administrative scheme.").

Plaintiff, applying the above considerations to the facts presented here, asserts that the Agreement does not require ongoing administration.   Plaintiff maintains that he is entitled to benefits "upon the happening of a single event: a change in control resulting in a diminution of his duties."   Plaintiff contends the benefits that he is entitled to are clear, and, other than averaging his bonus, there is nothing for Defendant to calculate. Plaintiff also states: "to the extent that a change in control agreement requires the ongoing administration of medical and life insurance, this administration occurs pursuant to a pre-existing duly constituted benefits plan."   Finally, Plaintiff asserts that the fact that Defendant must pay him over a two-year period is not sufficient to establish that the Agreement necessitates an ongoing administrative scheme.

Plaintiff portrays an overly simplistic view of Defendant's decision-making responsibilities regarding the Agreement.

Moreover, the overwhelming weight of factually comparable authority directs a finding that the Agreement requires an ongoing administrative scheme.  The facts presented in this case are very similar to those considered in *Bowles*, 266 F.3d at 631-32.  Here, twenty-two employees had twenty-four months following any change in control in which to exercise their rights under the Agreement.  In addition, an employee's rights could be triggered by a termination within six months prior to a change in control, if certain other conditions were present.  Like the defendant in *Bowles*, Defendant has to budget for the possibility of making multiple payments throughout this entire time period.  *Bowles*, 266 F.3d at 631-32. *See also Fort Halifax*, 482 U.S. at 12 (noting, in support of its finding that the law did not require employers to adopt an employee benefit *plan*, that the employer did not face "periodic demands on its assets that create a need for financial coordination and control").

In addition, the Agreement is not capable of "mechanical" application.  Defendant has to determine, for each impacted employee, whether that employee was terminated for cause or for physical nor mental incapacity, or quit for good reason.  Neither physical or mental incapacity is defined in the Agreement. Although "cause" and "good reason" are further clarified, the definitions are not so detailed that they eviscerate Defendant's discretion or the administrative obligations such discretion

imposes.  For example, in order to determine whether an employee is terminated for cause, the Agreement specifies that a majority of the Board must find that an employee acted in a particular manner (e.g., recklessly, unethically, etc.).  To determine whether an employee quit for good reason, Defendant must decide whether the employee suffered a diminution in position, authority, duties, or responsibilities as a result of the change in control.[12]  Moreover, even if a diminution occurred, Defendant must determine that it was not done for "cause," and that it did not result from a termination or outsourcing of a department or function.  Hence, Defendant is required to make individualized, discretionary determinations regarding the second triggering event.  *See Bowles*, 266 F.3d at 631-32.  *See also   Emmenegger*, 197 F.3d at 935 (stating that benefits conditioned on the reason for an employee's discharge and the employee's history of service requires an employer to exercise discretion; holding that such an arrangement was an ERISA plan); *Collins v. Ralston Purina Co.*, 147 F.3d 592, 596 (7th Cir. 1998) (stating that an agreement requiring an employer to pay benefits

---

[12] Plaintiff's assertion that the Agreement vests him with the authority to determine whether his resignation was for good reason finds no support in the Agreement, which provides that the diminution must be permanent, not done for "cause," and not a result of function or department outsourcing or termination.  The Agreement expressly gives Giant Food Inc. authority to make the for cause determination.  Moreover, it is unlikely that a covered employee would be privy to the knowledge required to make determinations regarding permanency, or functional/departmental outsourcing and termination.

only if a manager's job responsibilities were "substantially reduced" provided a standard, but not an easily discernible one, and that such a triggering event required "careful claims processing, in other words, an ongoing administrative scheme"); *Bogue*, 976 F.2d at 1323 (finding that an agreement requiring an employer to decide whether an employee's new job was "substantially equivalent" to his or her job prior to an acquisition required an ongoing administrative scheme).

Plaintiff relies, in part, on *Lomas*, 49 Fed. Appx. at 400. In *Lomas*, the Fourth Circuit considered a severance agreement providing for benefits if an employee quit for "good reason." The agreement defined "good reason" as a material diminution in status, a reduction in base salary, or a transfer to a location requiring the employee to move from his principal residence. The court noted that because the term "good reason" was defined in the agreement, it left the employer with no discretion to determine eligibility, and therefore the agreement was not inherently an ERISA *plan*. *Lomas* is unpublished and thus is not binding precedent. Moreover, although the details provided about the *Lomas* agreement are limited, it seems to be distinguishable from the Agreement in this case. The Agreement here applies to twenty-two executives while the *Lomas* agreement appears to apply only to the plaintiff in that case. In addition, the Agreement in this case requires more than a determination regarding a "diminution in status." Defendant must

consider whether there has been a diminution in position, authority, duties, or responsibilities, as a result of the change in control.  If such a diminution occurred, Defendant must also determine that it was not temporary, not done for "cause," and that it did not result from a termination or outsourcing of a department or function.  In addition, in order to be eligible for change in control benefits, an employee must waive the right to other severance benefits and must repay any severance benefits that have been paid.  These factual differences, along with the overwhelming weight of published authority from other Circuits considering similar severance arrangements, counsel for a different result than that suggested by the court in *Lomas*.  *See Simas*, 6 F.3d at 854 (noting there are not great factual differences between those cases finding a plan exists, and those that don't, but stating that "so long as *Fort Halifax* prescribes a definition based on the extent and complexity of administrative obligations, line drawing of this kind is necessary").

Plaintiff's reliance on *Emery*, which he mistakenly concludes "is on all fours with the situation here," is also misplaced.  *See Emery*, 354 F.Supp.2d at 595 (emphasizing that the agreement applied only to one employee and the employer's discretion was limited to whether the employee was fired for cause; distinguishing *Bogue* because the employer in that case was required to assess job equivalency).

21

The facts presented here are easily distinguished from the plant closing addressed in *Fort Halifax*.   The Agreement does not envision a one-time, mechanical payment of severance benefits, but instead exposes Defendant to periodic demands on its finances over a prolonged period and requires Defendant to make individualized eligibility determinations.   Hence, the Agreement requires an ongoing administrative scheme.

**b.  Reasonably Ascertainable Terms**

Because the Agreement does not appear to comply with ERISA's provisions regarding formal written plans, *see* 29 U.S.C. §§ 1022, 1102, the court must also determine whether the Agreement constitutes an informal ERISA plan.[13]  *See Donovan v. Dillingham,* 688 F.2d 1367, 1372 (11th Cir. 1982) (stating that the requirements of §§ 1022, 1102 "are not prerequisites to coverage under [ERISA,]" and noting that an arrangement may constitute an informal ERISA plan even where §§ 1022, 1102 are not met); *Cecil v. AAA Mid-Atlantic, Inc.*, 118 F.Supp.2d 659, 664 (D.Md. 2000) ("Having decided that an ongoing administrative scheme is present, the court must determine whether the terms of the plan are reasonably ascertainable," and thus, whether an informal ERISA plan exists).

---

[13] Although neither party addresses the Agreement's compliance with these ERISA provisions, the requirements do not appear to have been met.   For example, there is no evidence that Defendant furnished covered employees with a summary plan description meeting the specifications of § 1022.

22

In *Elmore v. Cone Mills Corp.*, 23 F.3d 855, 861 (4th Cir. 1994), the Fourth Circuit, adopting the *Donovan* test, stated:  "An informal ERISA plan has been established 'if from the surrounding circumstances a reasonable person can ascertain the intended benefits, a class of beneficiaries, the source of financing, and procedures for receiving benefits.'"  *Id.* (quoting *Donovan* 688 F.2d at 1372).  Although neither party addresses whether the Agreement fulfills the *Donovan* test, the court finds that the *Donovan* factors are satisfied.

First, the intended benefits are stated unambiguously  in the Agreement – base salary, bonus continuation, and health benefits, for twenty-four months.  Second, although arguably not on the face of the Agreement, a reasonable person could ascertain that the Agreement sought to benefit Giant employees whom the company wanted to retain following a change in control.  For example, the Agreement notes that Plaintiff is being offered the plan as a principal officer of Giant because the Board of Directors had "determined that it is in the best interests of the Company and its shareholders to assure that the Company will have Your continued dedication, notwithstanding the possibility, threat, or occurrence of a Change in control of the Company."  *See Donovan*, 688 F.2d at 1373 ("[T]he intended beneficiaries must include union members, employees, former employees or their beneficiaries.").  Third, the Agreement indicates that benefits are to be paid by the Company, or

23

by the Company's successor. *See Williams v. Wright*, 927 F.2d 1540, 1544 (11th Cir. 1991) (applying the *Donovan* test and noting that "the payment of benefits out of an employer's general assets does not affect the threshold question of ERISA coverage"). Finally, the procedures for obtaining benefits are reasonably clear from the terms of the Agreement - the benefits are triggered by a change in control, coupled with the employee's termination or voluntary resignation, provided certain conditions are met. If the triggering conditions are satisfied, and the employee waives the right to other severance benefits, Defendant must pay the specified benefits for twenty-four months. *See Cecil*, 118 F.Supp.2d at 665 (finding the procedures for receiving benefits to be reasonably clear where the employee was to receive benefits from the time of his retirement until his death, and the employer was required to manage certain accounts to provide those benefits).

Hence, under *Fort Halifax* and the authority interpreting and applying its reasoning, the Agreement requires an ongoing administrative scheme. In addition, even if the Agreement does not satisfy ERISA's formal plan requirements, it has reasonably ascertainable terms, and thus constitutes an informal ERISA plan. Accordingly, Plaintiff's state law claims are completely pre-empted, the removal is proper, and Plaintiff's motion to remand will be denied.

24

## C.  Plaintiff's Discovery Request

Because the court will deny Plaintiff's motion to remand on the current record, it must address his request that the court stay its decision pending discovery.  Plaintiff seeks to depose Richard Baird, Giant Inc.'s former CEO, as well as Frank Zampardi, former Vice President of Finance.  Plaintiff asserts that Mr. Baird's affidavit testimony on the administrative scheme underlying the Agreement was "obviously embellished," and maintains that the Mr. Baird exaggerated the time he spent administering the Agreement. Moreover, Plaintiff contends that Mr. Zampardi "will contradict many of Mr. Baird's more outlandish statements."  The exact amount of time Mr. Baird spent  performing administrative tasks is not material.  The relevant considerations are the amount of discretion Giant had in making eligibility determinations, including how much individualized consideration was required, as well as the ongoing nature of Giant's exposure to possible demands on its resources following a change in control.  In addition, other than Plaintiff's conclusory assertions, there is no evidence to suggest that Mr. Baird's testimony is not truthful.  Accordingly, Plaintiff's motion to stay the court's decision pending additional discovery on the remand issue will be denied.

III.   **Motion to Dismiss or for Summary Judgment**

A.  **Standard of Review**

Defendant has moved to dismiss for failure to state a claim under Fed.R.Civ.P. 12(b)(6) or, in the alternative, for summary judgment under Fed.R.Civ.P. 56.   A court considers only the pleadings when deciding a Rule 12(b)(6) motion.   Where the parties present matters outside of the pleadings and the court considers those matters, as here, the motion is treated as one for summary judgment.   *See* Fed.R.Civ.P. 12(b); *Gadsby by Gadsby v. Grasmick*, 109 F.3d 940, 949 (4th Cir. 1997); *Paukstis v. Kenwood Golf & Country Club, Inc.*, 241 F.Supp.2d 551, 556 (D.Md. 2003).

It is well established that a motion for summary judgment will be granted only if there exists no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.   *See* Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).   In other words, if there clearly exist factual issues "that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party," then summary judgment is inappropriate.   *Anderson*, 477 U.S. at 250; *see also Pulliam Inv. Co. v. Cameo Props.*, 810 F.2d 1282, 1286 (4th Cir. 1987); *Morrison v. Nissan Motor Co.*, 601 F.2d 139, 141 (4th Cir. 1979).   The moving party bears the burden of showing that there is no genuine issue as to any material fact and that he is entitled to

judgment as a matter of law.  *See* Fed.R.Civ.P. 56(c); *Catawba Indian Tribe of S.C. v. South Carolina*, 978 F.2d 1334, 1339 (4th Cir. 1992), *cert. denied*, 507 U.S. 972 (1993).

When ruling on a motion for summary judgment, the court must construe the facts alleged in the light most favorable to the party opposing the motion.  *See United States v. Diebold*, 369 U.S. 654, 655 (1962); *Gill v. Rollins Protective Servs. Co.*, 773 F.2d 592, 595 (4th Cir. 1985).  A party who bears the burden of proof on a particular claim must factually support each element of his or her claim.  "[A] complete failure of proof concerning an essential element . . . necessarily renders all other facts immaterial." *Celotex Corp.*, 477 U.S. at 323.  Thus, on those issues on which the nonmoving party will have the burden of proof, it is his or her responsibility to confront the motion for summary judgment with an affidavit or other similar evidence in order to show the existence of a genuine issue for trial.  *See Anderson*, 477 U.S. at 256; *Celotex Corp.*, 477 U.S. at 324.  However, "[a] mere scintilla of evidence in support of the nonmovant's position will not defeat a motion for summary judgment." *Detrick v. Panalpina, Inc.*, 108 F.3d 529, 536 (4th Cir.), *cert. denied*, 522 U.S. 810 (1997).  There must be "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted).

## B. Analysis

Defendant asserts two arguments in support of its motion. First, Defendant argues that the Agreement applied only to an initial change in control and therefore expired in the year 2000, twenty-four months following the Ahold acquisition. Second, Defendant maintains that even if the Agreement survived the Ahold acquisition, the consolidation between Giant and Stop & Shop did not constitute a change in control, as defined in the Agreement. Defendant does not, however, address the issue of whether Plaintiff has suffered a diminution in responsibilities that would qualify as "good reason" under the Agreement.

## 1. Applicability of Agreement

An ERISA plan is interpreted "using ordinary principles of contract law, enforcing the plan's plain language in its ordinary sense." *Bailey v. Blue Cross & Blue Shield of Va.*, 67 F.3d 53, 57 (4th Cir. 1995). When interpreting a plan, "[c]ontract terms must be construed to give meaning and effect to every part of the contract, rather than leave a portion of the contract meaningless or reduced to mere surplusage." *Goodman v. Resolution Trust Corp.*, 7 F.3d 1123, 1127 (4th Cir. 1993). The Fourth Circuit has noted the importance of the ERISA plan terms: "While a court should be hesitant to depart from the written terms of a contract under any circumstances, it is particularly inappropriate in a case involving ERISA, which places great emphasis upon adherence to the written

provisions in an employee benefit plan." *Coleman v. Nationwide Life Ins. Co.*, 969 F.2d 54, 56 (4th Cir. 1992).   A court may, however, refer to extrinsic evidence when the disputed ERISA plan terms are ambiguous.   *Bailey*, 67 F.3d at 58.

Defendant relies on multiple parts of the Agreement, as well as extrinsic evidence, to support its position.   First, Defendant states that the definitional section of the Agreement shows that the change in control provision can be triggered only once:

> In the very first paragraph of the Agreement, the "Company" is defined as "Giant Food Inc." Each of the prongs of the definition of "Change in Control" specifically makes reference to that [particular] entity. Subsection (i) refers to both "the Company" and 1224 Group, the shareholder group that owned Giant Food Inc. at the time. . . . Subsections (ii), (iii) and (iv) refer to 1224 Group and the "Class AC Stock," the class of stock held by that entity.

(Paper 13, at 6).

Second, Defendant relies on the particular articles used in the Agreement.   For example, Defendant references statements regarding "*a*" change in control, and "*the*" Company. Defendant maintains that if Giant Food Inc. had intended to cover multiple changes in control "it easily could have used the term 'any' or 'each' to express that intention."   (Paper 13, at 7).

Third, Defendant asserts that its interpretation of the Agreement's applicability is "consistent with extrinsic evidence describing the purpose and plan of the Agreement."   Defendant

29

quotes a memorandum from Pete Manos, then-President of Giant Food
Inc., to the Executive Compensation Committee, sent prior to the
Agreement's adoption.  In the memorandum, Mr. Manos states:

> Consequently, on the second anniversary of the
> change in control, the entire change of
> control program would cease to exist.  I
> believe that this limitation is reasonable.
> After two years, each officer should be able
> to determine his or her future career path,
> and any new owner should thereafter be free to
> make employment decisions unencumbered by this
> program.

(Paper 13, ex. A(2), at 3).

Conversely, Plaintiff asserts that the plain language of the
Agreement shows that it remained in effect following the initial
1998 Ahold change in control.  Plaintiff counters Defendant's
arguments regarding the use of singular tense articles, by pointing
to the definition of change in control, which uses the term "*any*"
versus "*a*."  For example, change in control is defined as "*any*
merger or consolidation," or "*any* transfer or sale . . . of stock."
(Paper 24, at 11).

Plaintiff also points out that, with regard to the Manos
memorandum, it was only a proposal and, more importantly, the
Agreement did not adopt all of the memorandum's language.  For
example, although Mr. Manos proposed that the change in control
agreement should be triggered if there was "a merger or
consolidation" or "a transfer or sale . . . of stock," the
Agreement uses the word "*any*."  Plaintiff contends that in light of

Giant's argument regarding the importance of the articles used in the Agreement, this difference is material.  Moreover, Plaintiff asserts that if the court were to consider extrinsic evidence, it should consider Giant's verbal and written statements following the announcement of the Stop & Shop consolidation.  Plaintiff maintains that on multiple occasions Giant officials reassured him that the Agreement remained in effect.

Defendant's assertion that it is entitled to summary judgment based on the plain language of the Agreement is unpersuasive. There is nothing in the language of the Agreement stating that it terminates following an initial change in control.  *See Coleman*, 969 F.2d at 56 (placing great emphasis on the terms of the written plan).  In fact, the section of the Agreement addressing termination states that it will terminate upon Plaintiff's death. Moreover, Plaintiff rightfully points out that Defendant's use of singular articles is at best inconsistent.  Most importantly, what neither party emphasizes, but what the court finds highly persuasive, is Section 11 of the Agreement, which addresses "Successors to the Company."  It states:

> The Company will require any successor (whether direct or indirect, by purchase, merger, consolidation or otherwise) to all or substantially all of the business and/or assets of the Company to expressly, absolutely and unconditionally assume and agree to perform this Agreement in the same manner and to the same extent that the Company would be required to perform it if no such succession had taken place.  As used in this Agreement,

31

> "Company" shall mean the Company as
> hereinbefore defined and any successor to its
> business and/or assets as aforesaid which
> assumes and agrees to perform this Agreement
> by operation of law, or otherwise.

(Agreement, ex. 1, at 7). In light of this provision, any argument premised on the use of the article "*the*" preceding "Company" is materially flawed, because the succession provision shows the Agreement contemplates that more than one Company may be implicated. In addition, this section states that successors to Giant Food Inc. will be required to assume the Agreement, without limitation – the Agreement states that a successor is to "assume and agree to perform this Agreement in the *same manner and to the same extent* that the Company would be required to perform it if no succession had taken place." The provision does not limit the successor's duties to making eligibility determinations during the twenty-four month time frame following the initial change in control, and paying out benefits to those employees it determined to be covered, nor is there any specification that the successor provision is not applicable to the change in control portion of the Agreement. Accordingly, Defendant has not shown that the Agreement, on its face, clearly establishes that the change in control provision was applicable only one time.

Defendant's reliance on extrinsic evidence to prove its assertion of single applicability is likewise problematic, because the extrinsic evidence is conflicting. The language of the Manos

32

memorandum suggests that the change in control provision was intended to apply only to an initial transaction, but the document was only a proposal and, as Plaintiff points out, there were at least some differences between what Mr. Manos proposed and what was later adopted.   Conversely, Plaintiff offers evidence which supports that Defendant regarded the Agreement as remaining in effect following the Stop & Shop transaction.[14]   For example, Plaintiff testified to his meeting with Mr. White, during which Mr. White stated that Plaintiff was not being offered a separate retention bonus because the Agreement was still in effect.   (Paper 24, ex. B., at 2).   Plaintiff also provides a letter dated April 7, 2004, in which Maureen McGurl, Executive Vice President of Human Resources for what appears to be both Giant and Stop & Shop, offers Plaintiff a new position following the Stop & Shop consolidation. Ms. McGurl states that the letter supercedes prior written agreements, "other than your Change in Control and Severance Agreement with the Company effective October 27, 1997." (Paper 24, ex. I, at 1).   However, when Plaintiff subsequently inquired about his eligibility for change in control benefits, he was told by a

---

[14] Defendant asserts that its later statements regarding the Agreement should not be considered because only extrinsic evidence "related to the formation of the contract" is relevant.   These later statements are related to the contract's formation because they help to illuminate what Defendant's intent was at the time the Agreement was formed.

company official that the change in control provision was no longer applicable. (Paper 27, ex. 1(B)).

Hence, the plain language of the Agreement regarding the applicability of the change in control provisions beyond the Ahold acquisition is, at best, unclear. Moreover, the extrinsic evidence in the record is inconsistent. Accordingly, Defendant has not met its burden and a grant of summary judgment to Defendant on this ground is improper.

## 2.  Change in Control

Defendant asserts that even if the Agreement did not terminate following the Ahold acquisition, the second transaction involving Giant and Stop & Shop did not constitute a change in control. Defendant summarizes the transaction as one in which a "new layer of ownership (Stop & Shop) was inserted between Giant of Maryland's parent, Giant Food LLC, and Giant Food LLC's parent, Ahold USA Holdings Inc. (formerly Giant Food Inc.). Defendant states "[n]either the ownership nor the corporate structure of Giant of Maryland or Ahold USA Holdings Inc. changed in connection with this restructuring. (Paper 13, ex. A, Decl. of Robert Licht, at 2).

Plaintiff counters that the transaction was a consolidation, and that following the reorganization Giant and Stop & Shop became one entity, which reported directly to the "corporate parent." Plaintiff relies, in part, on an Ahold press release which conflicts with Defendant's assertions that the transaction simply

34

involved an insertion of a new layer of ownership between Giant Food LLC and Ahold USA Holdings Inc.  The press release states: "[A] new business arena is in the process of being created to combine the administrative and managerial functions of Stop & Shop in the Boston area and Giant Food LLC in Landover, Maryland.  Ahold USA will now also be combined into this arena." (Paper 24, ex. D, at 1).  Plaintiff also provides a letter from Ms. McGurl, in which she refers to the "integration of Giant and Stop & Shop," and states that there is a "new organization structure."[15] (Paper 24, ex. I, at 1).   Moreover, Plaintiff proffers a letter from Ahold, stating that the head of Giant-Landover/Stop & Shop will now report directly to the CEO of Ahold Corporation, Anders Moberg, suggesting that some reorganization took place as a result of the transaction. (Paper 24, ex. J, at 1).  Finally, Plaintiff attaches a copy of what he maintains is a presentation given by Ahold executive Bill Grize on November 29, 2004, which indicates that Ahold USA was eliminated.[16]  (Paper 24, ex. L, at 1).  This presentation also presents Giant and Stop & Shop as being merged horizontally.

The nature of the transaction between Giant and Stop & Shop is far from clear.  Plaintiff's evidence, including multiple

_____

[15] The court notes that it is difficult to discern exactly what Giant entity (i.e., Giant of Maryland, Giant Food LLC, or Ahold USA Holdings, previously Giant Food Inc.) is referred to in this letter.

[16] Defendant does not dispute the authenticity of this document.

statements from Giant/Stop & Shop and Ahold officials, contradicts Defendant's assertion that neither the corporate structure of Giant of Maryland nor Ahold USA Holdings Inc. changed as a result of the transaction.   Mr. Grize's presentation provides further support that the Giant/Stop & Shop transaction entailed more than just the implementation of a separate layer of management.   Moreover, the presentation's characterization of the transaction as a horizontal combination conflicts with the organizational structure that Defendant purports resulted.   *See* (paper 24, ex. L, at 1; paper 13, at 11).   Hence, Defendant has not satisfied its burden of showing that there are no genuine issues as to any material fact and that it is entitled to judgment as a matter of law.   Defendant's motion for summary judgment will therefore be denied.   Plaintiff's request for a stay of the court's decision pending discovery regarding the nature of the consolidation will therefore be denied as moot.

## IV.   Conclusion

For the reasons stated, both Plaintiff's motion to remand and Defendant's motion for summary judgment will be denied.   A separate Order will follow.

_____/s/_____
DEBORAH K. CHASANOW
United States District Judge